UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LORETTA HILFIGER,

                              Plaintiff,

                                                            DECISION AND ORDER

                                                            05-CV-6040L

                    v.

MARK ALGER,
Steuben County Executive of Steuben County
Department of Social Services, et al.,

                              Defendants.

_____

        This case, involving an exceptionally convoluted administrative history, relates only to denial

of child-care benefits by a New York State Social Service Agency for a single month, July 2004.

The complaint is dismissed.

        Plaintiff, Loretta Hilfiger, appearing *pro se*, commenced this action on January 31, 2005.  In

her amended complaint, which plaintiff filed as of right on March 16, 2005, plaintiff asserts claims

under 42 U.S.C. § 1983, arising out of the discontinuance of her child day-care benefits in 2004.

Plaintiff has sued six defendants:  the Steuben County (New York) Department of Social Services

("DSS"); Steuben County Executive Mark Alger, who is sued in his official capacity only; Kathryn

Biehl, the Commissioner of DSS; Robert Plenge, the Deputy Commissioner of Administration and

Finance of DSS; Carla Hibbard, the Director of the Steuben Child Care Project ("SCCP"); and Joan

Simpson, a caseworker for SCCP.

DSS, Alger, Biehl, and Plenge (collectively "County defendants") have moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6), or in the alternative for summary judgment pursuant to Rules 12(d) and 56. Hibbard and Simpson have separately moved for the same relief, based on the same grounds and arguments advanced by the County defendants. Because both plaintiff and defendants have submitted materials outside the pleadings, I will treat defendants' motions as motions for summary judgment. *See* Fed. R. Civ. P. 12(b)(d).[1]

Plaintiff has filed what she styles as a "motion for determination of issues" (Dkt. #15), seeking "an order applying the civil doctrine of collateral estoppel precluding the defendant [DSS] from re-litigating factual findings established in an unreviewed State administrative hearing."

For the reasons that follow, defendants' motions are granted, plaintiff's motion is denied as moot, and the complaint is dismissed.

## ADMINISTRATIVE BACKGROUND[2]

On June 16, 2004, plaintiff gave birth to her second child, a daughter, Trinity. At that time, plaintiff was receiving New York State child care assistance benefits from DSS for day care for her

---

[1]I also note that plaintiff has been apprised of the nature of a summary judgment motion, of her obligation to respond, and of the consequences of not doing so. *See* Dkt. #21-9, #40 at 3-4.

[2]Unless otherwise stated, the facts are taken from the amended complaint and from a February 7, 2005 decision of the New York State Office of Children and Family Services, which was issued after a fair hearing on September 27, 2004. *See* Dkt. #21-4. Plaintiff does not appear to challenge or dispute the findings contained in that decision; in fact, her "motion for determination of issues" seeks to give collateral estoppel effect to those findings. *See* Dkt. #15 at 5.

son Alexander, who was born in 2001.  DSS contracted with SCCP to provide certain services in connection with the provision of child care assistance benefits, such as case management services and the issuance of payments to child care providers.

When she applied for benefits, plaintiff had signed and submitted a form providing that she would "notify SCCP of any change that w[ould] affect [her child care] subsidy case immediately and mail supporting documentation to [her] case worker within 15 days of the change."  Dkt. #24-5 at 27.  It was not until mid-July 2004, however, about a month after her daughter was born, that plaintiff informed SCCP by telephone of that fact.  *See* Dkt. #2 ¶ 51; Dkt. #21-4 at 4, ¶ 7.

In that same phone call, plaintiff also informed SCCP that she had been on disability leave from work since mid-May 2004 due to complications from her pregnancy, and she told SCCP that, for medical reasons, she was in need of continuous child care.  Dkt. #21-4 at 4, ¶ 7.  The case worker with whom plaintiff spoke asked plaintiff to provide documentation of her medical condition to support her claim of need for child care services for Alexander during the time when plaintiff was on leave from work.  *Id.*

Plaintiff alleges that on or about August 13, 2004, by which time she had returned to work, she received a telephone call at work from defendant Simpson, who told plaintiff that SCCP had been directed by DSS to deny plaintiff's child care payment for Alexander for the single month of July 2004.  Amended Complaint ¶ 52.  The reason given for this decision was the untimely notice by plaintiff to SCCP of her disability leave, and of her daughter's birth, both of which affected plaintiff's child care status.  *See* Amended Complaint Ex. 2.  Apparently the rationale was that since

plaintiff had been at home and not working since May, it was not obvious that she needed assistance caring for Alexander.

On or about that same date, plaintiff submitted to SCCP a nurse practitioner's note in response to SCCP's earlier request for medical documentation of her need for child care services. The note indicated that plaintiff had been on bed rest since May 19, 2004 due to pre-term labor, and that she had been "off 6 weeks post-partum (7/28/04)." Dkt. #21-4 at 4, ¶ 9.

In a letter to Simpson dated August 23, 2004, Barbara Mendez Toms, a legal advocate with the Disabled Workers' Coalition of the State of New York, referencing Simpson's prior telephone call to plaintiff informing plaintiff that her benefits had been denied for July 2004, stated that Simpson had "told [plaintiff] that once [her daughter] was born she was procedurally required to pull out her [son] from Daycare," and that "[n]o prior notice of this rule was ever given" to plaintiff. Dkt. #24-5 at 21. The letter stated that as a result of these events, plaintiff was "in default with the Childcare center," which had "demanded payment in the amount [sic] $500.00," and that the "center ... has indicate [sic] they would not extend a 'commitment' to place the newborn child until the debt is fully paid." *Id.* Mendez Toms "ask[ed] that [Simpson] provide Loretta Hilfiger with a copy of the regulation and/or policy statement referenced in [Simpson's] telephone determination and a copy of her rights, if any, under [SCCP's] program ... ." *Id.* at 22.

In a letter to plaintiff dated August 26, 2004, defendant Hibbard responded to Mendez Toms's August 23 letter, stating that DSS "had no other choice but deny payment [sic] for Alex's care for July," due to a number of circumstances. Dkt. #24-5 at 24. First, Hibbard referenced plaintiff's late notice of her daughter's birth and her disability leave. In addition, she noted that

- 4 -

although Simpson had requested in mid-July that plaintiff submit "a medical statement from [her] doctor on letterhead regarding [plaintiff's] physical condition," it took about a month for plaintiff to submit any documentation, which, Hibbard said, was "not correct as it [wa]s not signed by the doctor who attended [plaintiff]."  *Id.*

Plaintiff alleges that on or about September 2, 2004, she faxed to SCCP a note from her doctor stating that plaintiff "had preterm labor from 5/19/04 to 6/16/04" and that she "was postpartum 6/16/04 to 7/28/04."  The following day, however, SCCP issued a Notice of Intent to Discontinue Child Care Benefits, informing plaintiff that "[t]his agency intends to **stop** your payment of Child Care benefits effective 6/30/04," and that plaintiff's "case w[ould] be closed effective 7/1/04."  Dkt. #21-2 at 33.  The notice stated that the reason for this action was "Need for child care undocumented.  7/1-7/28/04."  It also stated, "On 8/12/04 verbal notification was given because no medical documentation had been received.  Child born on 6/16/04 ... no notification until 7/14/04.  No need for care documented."  *Id.*

On or about September 8, 2004, plaintiff's attorney contacted the Office of Administrative Hearings of the New York State Office of Temporary and Disability Assistance, arguing that the September 3 notice did not afford plaintiff timely notice of the proposed action.  Plaintiff was awarded continued aid benefits pending further action on her benefits.  Dkt. #21-4 at 5, ¶ 14.  On September 22, 2004, however, SCCP issued another notice informing plaintiff that her child care benefits would be discontinued effective September 29, and her case closed as of September 30, for plaintiff's "[f]ail[ure] to comply with requested documentation."  Dkt. #21-2 at 35.

On August 26, 2004, plaintiff requested a fair hearing to review the denial of her benefits for July 2004. Dkt. #21-4 at 5, ¶ 11. A hearing was held on September 27, 2004, before Administrative Law Judge ("ALJ") John G. Herriman. At the hearing, the ALJ took evidence concerning both the suspension of plaintiff's day care benefits for July 2004, and the decision to terminate her benefits completely as of September 29, 2004. Dkt. #21-4 at 12.

On February 7, 2005, the New York State Office of Children and Family Services ("OCFS") issued a decision in which it reversed the decisions by DSS both to suspend plaintiff's child day care benefits beginning July 1, 2004, and to terminate her benefits effective September 29, 2004. Dkt. #21-4 at 14-15. With respect to the suspension of benefits, OCFS found that the September 3 notice informing plaintiff of that suspension "was not timely inasmuch as it did not afford [plaintiff] ten day's [sic] notice of the negative action." *Id.* at 13.

OCFS added, however, that the "more pressing concern [with respect to that notice] involves closer analysis of the 'issuing authority' in this case." *Id.* In that regard, OCFS quoted state regulations providing that "[*n*]*otice of action* means a notice from a social services agency advising an applicant [or] recipient ... of any action the agency intends to take or has taken on any assistance or benefits ... ." *Id.* (citing 18 N.Y.C.R.R. § 358-2.15). OCFS stated that although the regulations did not prohibit a social services district from contracting with a private entity to administer its programs, "[t]his right however does not extend without limit, to the point where the contractor is delegated authority for making vital decisions such as those pertaining to the acceptance or denial of an application or the discontinue [sic] of benefits." *Id.* Thus, OCFS stated, "while there is nothing inherently wrong with the Agency delegating to SCCP the ministerial task of issuing a

Notice on the Agency's behalf, the determination that is set forth by the Notice must be one that has been passed upon <u>solely</u> by Agency officials."  Here, OCFS stated, "[i]t was  not disputed at the hearing that the local Agency played no role in the determination set forth by the September 3, 2004 Notice, and that being the case, the Notice is hereby found to be null & void."  *Id.*

With respect to the September 22 notice informing plaintiff of the determination to discontinue her benefits as of September 29, 2004, OCFS stated that "[f]or the same reasons set forth above, this Notice must be deemed null & void pending further review and re-determination by the local Agency.  This Notice also failed to adhere to timely notice requirements."  *Id.* at 14.  In addition, OCFS noted that SCCP had sent plaintiff a letter dated September 20, 2004, requesting medical documentation "to be submitted immediately," but, "[c]uriously, the Notice of Intent proposing to discontinue benefits was issued only two days later."  *Id.*  OCFS stated that SCCP should have given plaintiff at least ten days from September 20 to submit the documentation, before rendering any determination on plaintiff's benefits.  *Id.*

With respect to both notices, OCFS remanded the matter "for further Agency review and processing and for proper re-determination."  *Id.*  Specifically, the OCFS directed DSS and SCCP to:  "[t]ake no action to discontinue [plaintiff's] child care benefits under" the September 3 and 22 notices; reevaluate plaintiff's eligibility for continued child care benefits and to provide such benefits if it were determined that plaintiff was eligible; and render a new determination in writing, in compliance with the applicable state regulations.  *Id.* at 14-15.

Meanwhile, other events concerning plaintiff's benefits had occurred between the time of the fair hearing and the issuance of OCFS's decision.  Plaintiff states that on October 5, 2004, she

"received a 'certificate of childcare services' stating payment would only cover two mutually exclusive times; 9/1-9/13 and 9/13-9/30/2004." Amended Complaint ¶ 90.[3]  Plaintiff also alleges that, "[b]elieving that her September re-certification was denied plaintiff informed SCCP that she was withdrawing her children due to the September denial of subsidy." Amended Complaint ¶ 91. Plaintiff does not explain *why* she thought that her recertification had been denied, but in a letter addressed to both DSS and SCCP dated October 5, 2004, plaintiff stated, "Due to the denial of my September resertification [sic] for child care substidy [sic] I have withdrawn Alexander, Trininity [sic] Ford Im making arrangements for their care." Amended Complaint Ex. 9.

    In addition, the County defendants state that at some point "DSS recertified plaintiff to receive child care subsidy from October 1, 2004 to December 1, 2004 ...," but that after receiving plaintiff's October 5 letter withdrawing her children from the program, "DSS ... closed plaintiff's case effective October 8, 2004 ... ."  Dkt. #21 ¶ 11.[4]

    After receiving the notice that her case was being closed, plaintiff requested a second fair hearing.  Amended Complaint ¶ 93; Dkt. #21 ¶ 11.  On February 21, 2005, however, plaintiff

_____

[3]Plaintiff states at paragraph 90 of the amended complaint that "a copy of the certificate is attached as Exhibits 7 and 8" to the amended complaint.  Exhibits 7 and 8, however, both cover the same period, September 13 to September 30, 2004, for plaintiff's son and daughter respectively.  Exhibit 8 also contains an anonymous handwritten notation, "9/1 - 9/13/04 eff. 9/14 - 9/30/04 Parent fee 12.00 a wk to Lori GCC."

[4]Defendants have submitted copies of child care services certificates for each of plaintiff's children for the following periods in 2004:  September 1-12; September 13-30; October 1 through December 1; and October 1-8. Dkt. #21-5.  Apparently the certificates for October 1-8 reflect the closing of plaintiff's case effective October 8, after she had previously been recertified through December 1.

submitted a signed form indicating that she was withdrawing her fair-hearing request.  Dkt. #21-5 at 13.

Following the issuance of the fair-hearing decision on February 7, 2005, DSS sent a letter to plaintiff dated February 17, 2005, asking her to submit certain documents in support of her claim for benefits for July 2004, including a written statement from her doctor indicating that plaintiff was "unable to care for [her] four-year-old child during the period July 1 – July 31, 2004."  Dkt. #21-6 at 2.  DSS stated that "[t]his information is required in order for this Agency to render a new determination concerning [plaintiff's] eligibility for day care services ...," and that "[p]ursuant to the directive in the fair hearing decision, [plaintiff was] required to provide the above documentation within ten (10) days ... ."  *Id.*

In response to that request, plaintiff submitted an undated note from her physician stating,

> Loretta delivered 6/16/04.  She was seen 7/28/04 for post-partum clearance.  I cannot comment on whether she was able to care for 3 y.o. in July.  She did contact our office in July regarding her need for continued assistance on 7/14/04, but I have no details on her symptoms at that time, however, I have no reason to doubt her request of 7/14/04.

Dkt. #21-6 at 4.[5]

On April 18, 2005, DSS issued a Notice of Intent to Change Child Care Benefits (Dkt. #21-6 at 11), informing plaintiff that DSS had determined that she was ineligible for child care benefits for the month of July 2004.  The notice set forth the following reasons for DSS's decision:

> Your child, Alexander Ford, was not eligible for childcare benefits for the time period 7/1/04-7/31/04 as the use of public funds for childcare assistance can only be provided in cases where it is determined that there is a need because of the parent's inability to provide

---

[5]DSS then sent a letter to plaintiff's physician, with a copy of that note, asking him to confirm that the note came from him.  Dkt. #21-6 at 6.  He responded that the note "was written at [his] direction by [his] nurse."  Dkt. #21-6 at 8.

care and supervision for a substantive part of the day.  The medical documentation you
submitted did not support your inability to provide care and supervision for your child.

Dkt. #21-6 at 11.  The notice also informed plaintiff that she had sixty days in which to request a fair

hearing on DSS's decision.  Dkt. #21-6 at 12.  She did not do so.[6]

## LITIGATION HISTORY

As stated, plaintiff commenced the instant action on January 31, 2005.  The amended

complaint, which was filed on March 16, 2005, asserts three causes of action.  The first alleges that

"there is a failure to train, supervise, *monitor* and discipline [presumably on the part of DSS]

amounting to deliberate indifference to the constitutional rights of plaintiff ... ."  Amended

Complaint ¶ 101.  This claim also alleges that DSS knew "that there is a history within SCCP of

mishandling childcare subsidy applications and of wrongfully denying and/or improperly delaying

applications ... ."  *Id.*  Plaintiff alleges that "this failure [to train, supervise, etc.] amounts to

deliberate indifference by the defendants to the constitutional rights of individuals to adequate and

timely notice and to continuing aid pending appeal."  *Id.*  The cause of action as alleged does not

identify any particular constitutional right that is alleged to have been violated, however.

The second cause of action alleges that pursuant to defendants' policies and practices,

"recipients have their childcare subsidy summarily suspended and/or denied by a private contractor

---

[6]Although OCFS had also remanded with respect to the discontinuance of plaintiff's
benefits as of September 29, 2004, the April 15, 2005 notice did not address that matter,
presumably because it had been rendered moot by DSS's recertification of plaintiff for the period
from October 1 to December 1, 2004, and by plaintiff's subsequent withdrawal from the
program.

without the pre-deprivation notice, agency conference, and continuing aid," and that defendants thereby violated plaintiff's rights under the Fourteenth Amendment to the United States Constitution. *Id.* ¶¶ 103, 104.

The third cause of action alleges that "Defendants' retaliation against plaintiff for her assertion of her rights to seek redress of grievances violates her rights under the First and Fourteenth Amendments." *Id.* ¶ 106. Plaintiff alleges that defendants' "retaliation against plaintiff was ... motivated by plaintiff's complaints to the Department of Health and Human Services and her fair hearing request regarding the practices and policies of the defendants." *Id.* ¶ 108. That appears to be the first mention of the word "retaliation" in the amended complaint, however, and it is not clear precisely what defendants are alleged to have done or failed to do in retaliation for plaintiff's exercise of her rights.

It is also not entirely clear exactly what harm plaintiff is alleging that she suffered as a result of defendants' actions. She appears to allege that she has incurred some out-of-pocket expenses for day care, for which she has never been reimbursed or received any subsidy, as a result of the denial of her benefits for July 2004. She also alleges that the denial of plaintiff's July 2004 benefit caused her to fall behind in her payments to her day care provider, which in turn caused plaintiff to forfeit the spot being held by that provider for her daughter, who was scheduled to begin day care in the fall of that year. As a result, plaintiff alleges, she now has to "travel[] an extra twenty-eight miles a day to another [day care] provider outside the county." Amended Complaint ¶¶ 54-57.

Plaintiff also appears to allege that, aside from issues of insufficient notice, defendants' denial of payment for July 2004 was erroneous. *See* Amended Complaint ¶¶ 88, 89. As stated,

however, plaintiff never requested a fair hearing with respect to DSS's April 18, 2005 determination finding that plaintiff was ineligible for benefits for July 2004.  In addition, on February 21, 2005 plaintiff withdrew her most recent fair-hearing request with respect to the closing of her case effective October 8, 2004.

Based on these allegations, plaintiff seeks the following relief.  First, she seeks an order enjoining the County defendants from failing to provide "timely and adequate notice" and "continuing aid pending appeal ... ."  Amended Complaint at 12.  She also requests an order directing the County defendants "to adopt and implement policies and procedures to prevent DSS officers and its agents from depriving persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States ... ."  *Id.*

In addition, plaintiff seeks a declaration that defendants maintained policies "exhibiting deliberate indifference to the constitutional rights of its citizens to receive adequate and timely notice, which caused the violations of Mrs. Hilfiger's rights ... ."  *Id.*  She also seeks compensatory damages for "economic loss, emotional distress, and loss of subsidy opportunity," as well as punitive damages, all in unspecified amounts.  *Id.*

## DISCUSSION

## I. Defendants' Motion

## A. Failure to Comply with State Regulations

Defendants move for summary judgment on two grounds.  First, they contend that plaintiff has alleged only that DSS failed to comply with its own regulations, which does not in itself give rise

to a constitutional claim.  Second, they argue that plaintiff has failed to exhaust her administrative remedies, which defeats her procedural due process claims.

It is true that a state's violation of its own regulations does not necessarily amount to a constitutional violation.  *See Magluta v. Samples*, 375 F.3d 1269, 1279 n. 7 (11th Cir. 2004) ("There is no constitutional violation when state actors fail to meet their own regulations, so long as the minimum constitutional requirements have been met") (quoting *Black v. Parke*, 4 F.3d 442, 448 (6th Cir. 1993)); *accord Jackson v. Cain*, 864 F.2d 1235, 1251 (5th Cir.1989); *Johnson v. Goord*, 487 F.Supp.2d 377, 385 (S.D.N.Y. 2007).

The mere fact that the ALJ based his decision on a violation of state regulations, however, does not mean that defendants could not also have violated plaintiff's federal constitutional due process rights as well.  The Court must still determine whether the process that was afforded to plaintiff met the requirements of the Constitution.

## B. Lack of Predeprivation Notice and Availability of Postdeprivation Remedies

In general, once a state agency has determined that an individual qualifies to receive a benefit, the recipient may not be deprived of that benefit without due process of law.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).  In the context of public assistance benefits, due process typically requires predeprivation notice and an opportunity to be heard.  *Goldberg v. Kelly*, 397 U.S. 254, 260-61 (1970); *Hart v. Westchester County D.S.S.*, No. 98 Civ. 8034, 2003 WL 22595396, at *4 (S.D.N.Y. Nov. 7, 2003).  Whether notice satisfies the requirements of due process presents a question of law to be determined by the court.  *See, e.g.*, *Molski v. Gleich*, 318 F.3d 937,

951 (9th Cir. 2003); *Harris v. City of Philadelphia*, 47 F.3d 1333, 1338 (3d Cir. 1995); *Jordan v. Benefits Review Bd. of United States Dep't of Labor*, 876 F.2d 1455, 1458-59 (11th Cir. 1989).

"The standard the defendant[s] must meet here is not high:  the U.S. Constitution requires only 'some pretermination opportunity to respond.'" *Chmielinski v. Massachusetts*, 513 F.3d 309, 316 (1st Cir. 2008) (quoting *Loudermill*, 470 U.S. at 542); *accord Rivera-Powell v. New York City Bd. of Elections*, 470 F.3d 458, 467 (2d Cir. 2006).  It appears, however, that even this standard was not met here, at least with respect to the denial of plaintiff's July 2004 benefits.

Plaintiff was apparently given no prior notice of the denial of her benefits for July 2004. According to plaintiff, she was informed by telephone on or about August 13, 2004 that her benefit payment for July had been denied.  *See also* Dkt. #24-5 at 31 (Notice of Intent to Discontinue Child Care Benefits issued to plaintiff on September 3, 2004, stating that "[o]n 8/12/04 verbal notification was given because no medical documentation had been received").  Although there was some additional correspondence between plaintiff and defendants, and eventually a fair hearing, it does not appear that plaintiff received any notice, or any meaningful opportunity to be heard, before her benefits were denied.

Defendants argue that plaintiff's due process claim is defeated because she was provided with adequate postdeprivation remedies, and that she did not avail herself of those remedies.  Specifically, defendants note that:  plaintiff prevailed at her fair hearing; she withdrew her second fair-hearing request relating to the closing of her case in October 2004; and she never even requested a fair hearing with respect to the April 18, 2005 DSS decision, which, on remand from the ALJ, reaffirmed the denial of her benefits for July 2004.

As stated, a deprivation of a public benefit ordinarily cannot constitutionally be effected without some predeprivation notice and opportunity to be heard. There is an exception to that rule, however, under the so-called *Parratt/Hudson* doctrine. Under that doctrine, as expressed by the Supreme Court, a state actor's "random and unauthorized" deprivation of a protected interest does not result in a violation of procedural due process, as long as the state provides an adequate postdeprivation remedy. *See Hudson v. Palmer*, 468 U.S. 517, 533-33 (1984); *Parratt v. Taylor*, 451 U.S. 527, 543-44 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986); *see also Hellenic American Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 881 (2d Cir. 1996), *cert. denied*, 521 U.S. 1140 (1997). The rationale for this rule is that, in instances of "random and unauthorized conduct" by state officials, "additional pre-deprivation safeguards would have little value in preventing an erroneous deprivation of the protected [property] interest." *Mard v. Town of Amherst*, 350 F.3d 184, 193 (1st Cir. 2003); *see also Michalowicz v. Village of Bedford Park*, 528 F.3d 530, 535 (7th Cir. 2008) ("Because such misconduct is inherently unpredictable, the state's obligation under the Due Process Clause is to provide sufficient remedies after its occurrence, rather than to prevent it from happening").

In response to defendants' argument, plaintiff argues that defendants' actions in this case cannot fairly be characterized as "random and unauthorized." She contends that DSS delegated broad authority to SCCP to administer its child care assistance program, and that DSS's contract with SCCP did not require SCCP to adhere to any particular procedural safeguards. Accordingly, plaintiff argues, SCCP's summary denial of plaintiff's benefits cannot be characterized as unpredictable.

There is authority that "government actors' conduct cannot be considered random and unauthorized within the meaning of *Parratt* if the *state* delegated to those actors 'the power and authority to effect the very deprivation complained of ... [and] the concomitant duty to initiate the procedural safeguards set up by state law,' even if the act in question 'was not ... sanctioned by state law.'" *Rivera-Powell*, 470 F.3d at 465 (quoting *Zinermon v. Burch*, 494 U.S. 113, 138 (1990)) (emphasis added). *See also Bogart v. Chapell*, 396 F.3d 548, 563 (4th Cir. 2005) ("where ... state employees ... have broad authority to effect deprivations, as well as the duty to provide predeprivation procedural safeguards, the *Parratt/Hudson* doctrine is inapplicable"); *Hamlin v. Vaudenberg*, 95 F.3d 580, 584 (7th Cir. 1996) ("If state procedures allow unfettered discretion by state actors, then an abuse of that discretion may be predictable, authorized, and preventable with pre-deprivation process").

As the fair-hearing decision in this case makes clear, however, New York State has published extensive regulations concerning the denial, discontinuance, suspension or reduction of benefits such as those at issue here. In particular, the regulations set forth the form and timing of the notice that must be given prior to the taking of such action, as well as the provision of aid continuing. *See* 18 N.Y.C.R.R. §§ 358-2.2, 358-2.3, 358-2.5, 358-2.15, 358-2.23, 358-3.3, 358-3.6. With respect to the denial of plaintiff's benefits for July 2004, OCFS found that the notice to plaintiff of that denial was inadequate precisely because it did *not* comply with the ten days' notice requirement contained in those regulations. *See* Dkt. #21-4 at 13 (citing 18 N.Y.C.R.R. § 358-23).

A number of courts have found that where state procedural safeguards exist, a state actor's failure to follow the prescribed procedures is "random and unauthorized" within the meaning of *Parratt* and *Hudson*. In my view, that is what occurred here. In *Germano v. Winnebago County,*

*Illinois*, 403 F.3d 926, 929 (7th Cir. 2005), in which a group of retired county sheriff's deputies sued the county, alleging that their due process rights had been violated when the county required them to pay higher health care premiums than were required from currently employed deputies, the Court of Appeals for the Seventh Circuit held that because the county's "actions ... were not authorized by the state," but instead "were in direct violation of state law," those acts did not provide "a basis for a due process claim." *Id.* at 929.

In so ruling, the court rejected the plaintiffs' argument that "the action by the county board [which made the decision at issue] cannot possibly be considered unauthorized because the county board acts as Winnebago County and is the final decision maker on issues delegated to it by the state." *Id.* at 928. The Seventh Circuit stated that "even if the county is permitted to exercise some discretion on issues such as health insurance for retired deputies, the discretion is not unregulated. A county only has discretion to act in a way that is consistent with state law." *Id.* (citation omitted). *See also Bogart v. Chapell*, 396 F.3d 548, 561-62 (4th Cir. 2005) (where state "prescribed precisely how the Defendants were to act," defendants' failure to act as prescribed could not have been predicted, and procedural due process claim was barred under *Parratt*/*Hudson* doctrine); *Hamlin v. Vaudenberg*, 95 F.3d 580, 584 (7th Cir. 1996) ("given the [state actor]'s failure to adhere to the correct procedures, Hamlin's alleged deprivation was in spite of rather than because of state procedures"); *Rafiy v. Nassau County Med. Ctr.*, 218 F.Supp.2d 295, 304 (E.D.N.Y. 2002) ("Because the Rafiys have not alleged that state law procedures were inadequate, but only that [county medical center employees] failed to follow such procedures, the Rafiys cannot make out a due process violation in this case").

Applying these principles here, I conclude that the denial of plaintiff's July 2004 benefits without prior notice was "random and unauthorized" within the meaning of *Parratt* and *Hudson*. Under established, state-mandated procedures, plaintiff's benefits could not be terminated or suspended without prior notice. Defendants' failure to comply with the notice requirements thus was not authorized by New York State and could not have been predicted. The availability of an adequate post-deprivation remedy, which was clearly available here, therefore satisfied the requirements of due process.

The fact that *DSS* may have delegated to SCCP its authority to make decisions about eligibility for benefits, without specifying any notice procedures that were to be followed, does not change this result. As OCFS noted in its fair-hearing decision, that wholesale delegation of authority over "vital decisions such as those pertaining to the acceptance or denial of an application or the discontinu[ance] of benefits" was impermissible under the state regulations, and was itself an unauthorized act.[7] That DSS was *able* to delegate its authority in this manner, then, does not mean that it was *authorized* to do so. If it were otherwise, it is difficult to imagine when an act taken by a state actor could ever be characterized as "random and unauthorized."

Furthermore, it appears that although DSS may have engaged in a *de facto* delegation of such authority, that delegation was not even authorized under the County's own contract with SCCP. The contract for SCCP's services provides that *DSS* would "[m]aintain authority over all case actions

_____

[7]In addition, to the extent that plaintiff's papers can be read as asserting that, apart from any failure by SCCP to comply with state procedural requirements, DSS's delegation of authority to SCCP violated her rights, I conclude that plaintiff has failed to establish a federal constitutional claim under § 1983. DSS's actions in this regard may have been contrary to state law and regulations, but plaintiff has not shown how those actions violated her rights under federal law. *See Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003); *Katz v. Klehammer*, 902 F.2d 204, 206-07 (2d Cir. 1990); *Johnson v. Goord*, 487 F.Supp.2d 377, 385 (S.D.N.Y. 2007).

related to child care subsidy services," and that it would "authorize or deny within a 30-day time frame according to the eligibility regulations set by New York State." Dkt. #40 at 16. Thus, SCCP's summary denial of plaintiff's July 2004 benefit was not authorized by either the applicable state regulations or by the contract between it and the County.

Plaintiff also makes the conclusory allegation that defendants have engaged in a pattern or practice of denying benefits without adequate notice, *see* Amended Complaint ¶ 35. There is some authority that post-deprivation remedies might not suffice where the conduct complained of, even though unauthorized by statute or regulation, forms a "regular pattern" on the part of the state actors involved. *See*, *e.g.*, *Mard*, 350 F.3d at 194; *O'Neill v. Baker*, 210 F.3d 41, 50 (1st Cir. 2000). The evident rationale for that rule is that such conduct, because it occurs regularly, cannot be deemed unpredictable. *See Zinermon*, 494 U.S. at 136 (declining to extend the "random and unauthorized conduct" standard to situations where a deprivation of rights is predictable).

There is no evidence before me supporting the assertion that the practice was widespread.[8] All that plaintiff has shown is that in this one instance, her benefits were denied without adequate notice. That is not enough to give rise to an issue of fact that could defeat defendants' motion for summary judgment.

In addition, plaintiff asserts that the County defendants failed to adequate train or supervise SCCP with respect to decisions involving the denial of benefits. The Court is not aware, however,

---

[8]Discovery in this action has been completed. *See* Dkt. #14. In addition, on March 18, 2008, Magistrate Judge Jonathan W. Feldman denied plaintiff's motion to compel additional discovery. Dkt. #35. In so ruling, Magistrate Judge Feldman noted that in her response to defendants' summary judgment motion, which was filed before plaintiff's motion to compel, "plaintiff did not indicate that she needed additional discovery in order to respond to defendants' motion." *Id.*

of any "case which has held that the Constitution requires a government to provide more personnel or more training in order to reduce the risk of random and unauthorized acts of neglect of duty." *Powell v. Georgia Dep't of Human Resources*, 114 F.3d 1074, 1082 (11th Cir. 1987) (adding that "[t]he *Parratt* decision suggests just the opposite"). In virtually every case involving an unexpected deviation from prescribed procedures, better training and closer supervision might arguably have prevented the violation from occurring. If that were enough to avoid the *Parratt/Hudson* rule, it is difficult to see when a violation would ever fall within the scope of that rule.

I conclude, therefore, that the failure to give plaintiff adequate notice or a predeprivation opportunity to be heard with respect to the denial of her July 2004 benefit payment was a "random and unauthorized" act, for which a meaningful post-deprivation remedy would suffice to meet the demands of due process. I also find that the procedures that were available to plaintiff were adequate. Plaintiff was granted a fair hearing, at which she prevailed, and although she was advised of her right to request another fair hearing after her July 2004 benefits were again denied on remand, she never made such a request.

There were, then, adequate post-deprivation remedies available to plaintiff–whether she availed herself of them or not–and that defeats her due process claim. *See Fetto v. Sergi*, 181 F.Supp.2d 53, 82 (D.Conn. 2001) ("the fact that the plaintiff was provided with a postdeprivation remedy in the form of [an] administrative hearing ..., and the fact that he has not shown by a preponderance of the evidence that this remedy was not meaningful, indicates that his due process rights were not violated"); *Dworkin v. City of New York*, No. 95 Civ. 10261, 1996 WL 673815, at *4 (S.D.N.Y. Nov. 20, 1996) ("plaintiff's failure to make any request for a ... hearing obviates the need for such a hearing").

For the same reasons, I conclude that defendants are entitled to summary judgment with respect to plaintiff's due process claim concerning the termination of her benefits as of October 8, 2004.  By plaintiff's own admission, she informed defendants, first, that she was withdrawing both her children from the child care assistance program, and second, that she was withdrawing her fair-hearing request as to the termination of her benefits.  She has made no showing whatsoever that meaningful post-deprivation remedies were unavailable to her concerning these matters.[9]

## C. Retaliation Claim

In her third cause of action, plaintiff alleges that defendants retaliated against her because of "her assertion of her rights to seek redress of grievances ... ."  Amended Complaint ¶ 106.  This claim must also be dismissed.

_____

[9]I also note that even if plaintiff could establish that her due process rights were violated by the failure to give her a predeprivation hearing with respect to the denial of her July 2004 benefits, the fact remains that DSS reached the same decision on remand from OCFS, and there has been no showing that *that* decision–which plaintiff never challenged administratively–was incorrect.  Unless plaintiff could show some actual injury flowing from the denial of due process itself, then, it appears that plaintiff would be entitled only to nominal damages on this claim in any event.  *See Carey v. Piphus*, 435 U.S. 247, 266-67 (1978) (where plaintiffs were suspended from school without due process, but suffered no actual injury because their suspensions were justified, plaintiffs would be entitled to nominal damages not to exceed one dollar); *accord Farrar v. Hobby*, 506 U.S. 103, 112 (1992); *see also Kassim v. City of Schenectady*, 415 F.3d 246, 250 (2d Cir. 2005) (where plaintiff had "identified neither facts nor arguments he could have advanced in a pre-eviction hearing that might have obviated his eviction or reduced his losses," and he "d[id] not dispute that he failed to pursue post-deprivation remedies that were available to him to contest his eviction," plaintiff had "shown no reason why the [trial] court's restriction on compensatory damages deprived him of any entitlement"); *Brody v. Village of Port Chester*, 345 F.3d 103, 112 (2d Cir. 2003) ("compensatory damages would be appropriate only where the plaintiff could demonstrate that he had suffered some injury as a result of the denial of due process, ... such as by showing that the outcome would have been different had process been afforded, or that he had suffered emotional distress directly from the denial of due process, rather than from the denial of the liberty or property interest") (citing *Carey*, 435 U.S. at 266-67).

Case 6:05-cv-06040-DGL-JWF Document 46 Filed 10/06/08 Page 22 of 25

Even giving the complaint the generous construction due to *pro se* pleadings, I fail to see any allegations, much less evidence, supporting this claim. An essential element of any First Amendment retaliation claim is a causal nexus between the protected conduct and the adverse action. *See*, *e.g.*, *Cotarelo v. Village of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006); *Burkybile v. Board of Educ. of Hastings-On-Hudson Union Free School Dist.*, 411 F.3d 306, 313 (2d Cir.), *cert. denied*, 546 U.S. 1062 (2005). To establish such a nexus, the plaintiff must show that the protected activity was a motivating factor in the adverse action taken by the defendant. *Beechwood Restorative Care Center v. Leeds*, 436 F.3d 147, 152 (2d Cir. 2006).

In the case at bar, plaintiff simply makes the conclusory allegation that defendants retaliated against her because of her attempts to challenge the suspension or denial of her benefits. Although the complaint does not articulate how defendants retaliated against plaintiff, plaintiff's motion papers allege that defendants "trumped up deficiencies in her childcare eligibility resulting in the termination of her benefits, refused to provide aid continuing, presented fictitious and misleading explanations for the termination of her benefits and failed or refused to take appropriate action to remedy the effects of the retaliatory treatment." Dkt. #44-2 at 3.

Those allegations cannot save plaintiff's retaliation claim. First, there is zero evidence indicating any causal connection between plaintiff's protected activity and any adverse actions that defendants took toward her.[10]

---

[10]Defendants do not appear to argue that plaintiff did not engage in constitutionally protected activity, and at least for purposes of the pending motions I assume that she did. *Cf. Bowen v. Watkins*, 669 F.2d 979, 982 n. 2 (5th Cir. 1982) (treating police officers' request for a hearing challenging denial of promotion as constitutionally protected activity); *Jones v. Bernanke*, 538 F.Supp.2d 53, 57-58 (D.D.C. 2008) (implicitly finding that plaintiff's request for EEOC hearing was protected activity); *Michaelis v. Deluxe Financial Services, Inc.*, 470

(continued...)

- 22 -

Plaintiff was informed that her benefits for July 2004 had been denied, and she took certain steps to challenge that decision, including requesting a fair hearing. Prior to the fair hearing, defendants informed plaintiff that her case would be closed at the end of September 2004, but there is no indication that this decision was in any way prompted by plaintiff's protected activity. Throughout this time, the reasons given by defendants for their decisions remained the same: plaintiff had not given them timely notice of a material change in her circumstances, and she had thereafter failed to submit proper or sufficient documentation demonstrating her need for child care services.

In addition, the record shows that plaintiff's case was *not* closed at the end of September 2004, and that defendants *approved* her benefits not only for that month, but for the following two months as well. It was only after plaintiff herself indicated that she was withdrawing both her children from the program that her case was closed. None of these events is in any way suggestive of retaliation.

Finally, plaintiff's conclusory allegations concerning "trumped up deficiencies" and "fictitious and misleading explanations" are not supported by any evidence. Defendants asked for certain documentation of plaintiff's need for child care services, and they found the materials submitted by plaintiff to be wanting in that regard. Although plaintiff may disagree with their

---

[10](...continued)
F.Supp.2d 1258, 1268 (D.Kan. 2007) (discussing plaintiff's appeal from disability benefits plan administrator's denial of benefits as protected activity). The mere fact that plaintiff engaged in protected activity, however, does not necessarily mean that any subsequent adverse action by defendants gave rise to a retaliation claim. *See Mayer v. Gottheiner*, 382 F.Supp.2d 635, 660 (D.N.J. 2005) ("the mere fact [that plaintiff] was contesting tickets and filing Notices of Tort Claims does not ... automatically give rise to a constitutional violation for any subsequent adverse municipal actions against him").

decision, there is no evidence that defendants concocted any false reasons for what they did. This claim must therefore be dismissed. *See Dolberry v. Levine*, 567 F.Supp.2d 413, ___ (W.D.N.Y. 2008) ("Simply adding an allegation that [defendants] acted out of retaliatory motives [when they took action adverse to plaintiff] is easy to do, but it is not enough").

## II. Plaintiff's Motion

In her "motion for determination of issues," plaintiff seeks to give estoppel effect to the findings made by the ALJ following the September 27, 2004 fair hearing, particularly the ALJ's conclusions that the September 3 and September 22 notices were untimely, and that DSS had improperly delegated to SCCP its authority to make decisions whether to grant or deny applications for benefits, or whether to discontinue benefits. Defendants oppose the motion on a number of grounds.

Plaintiff's motion is denied as moot. Even if I were to give preclusive effect to the ALJ's findings (and it is not at all clear that I should, since many of them appear to constitute conclusions of law rather than findings of fact), that would not change my decision in this case, for the reasons set forth above. Whether I accept those findings and conclusions or not, plaintiff has not presented a viable claim under § 1983.

## CONCLUSION

Defendants' motions to dismiss or in the alternative for summary judgment (Dkt. #21, #40) are granted, and the complaint is dismissed.

Plaintiff's motion for determination of issues (Dkt. #15) is denied as moot.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
      October 6, 2008.